We do have five cases on our calendar this morning and we'll start with Chivers v. Reaves, case number 17-4169 and we'll start with Mr. Mortensen. May it please the court, Paul Mortensen representing the appellant Stacey Chivers. I'm sort of planning on using 10 minutes and reserving five minutes. We'll see if that happens and may I assume that the court is well familiar with the facts in this case? Yes. As presented, this case asks if because shots were fired at law enforcement officers, this court will forsake its carefully formulated jurisprudence regarding false arrest, excessive force and warrantless home searches. The defendants herein and the lower court have taken the position that because of that situation, this court can look aside from the clear test that have been applied in all of these areas of the law and we can just kind of go to a was subjected to being shoved face down in the ground, held in a police car, hauled to the police station, interrogated like a criminal even though she was not one, then dumped out afterwards with no help of any kind. Counsel, you just ask us if we're familiar with the facts and the way you've outlined your argument, it would sure help me a great deal if you would go to your best, what you think is your best argument, your second best argument and bring me down there because we've read the facts, we understand and we've looked at your brief so it sure would help me if you get right to the point. We've got four or five big areas, your honor, and I don't want to imply that by not going into all of them that I don't stand by all of them. I'm not going to be able to cover them all. Well, do the best you can. Regarding whether or not voluntary consent was given, I really love the quote from the Calc case with my client being held in a police car after having had a gun brandished at her, after having been shoved down and handcuffed and everything and she's held in the car and she's given some statements, we're going to take you to the police car or police station, how in Calc quoting, I haven't got who they were quoting, but it says, as for the lack of, oh it was Calc itself, as for the lack of resistance, failure to struggle with a cohort of deputy sheriffs is not a waiver of Fourth Amendment protection which does not require the perversity of resisting arrest or assaulting a police officer. Again, my client, at the time that she spoke with the representative carpenter of the county attorney's office, there'd been a gun brandished at her. Whitehead had used extremely aggressive language, get down, get down, on your stomach, you know, whatever. Well, Mr. Mortensen, when when officer Whitehead had first applied handcuffs at that time, by the time that your false arrest claim, which you're getting into now, begins, Detective Whitehead had already released the handcuffs, she had already, in the exchange on the audio, on the video, says, well why, I didn't understand why you did all of that, and Detective Whitehead says, well at the time we didn't know any of that, and so at the time that the false arrest has its inception, all of the preceding events had already expired, and he had already explained to her why all of that had taken place. No, it hadn't been explained to her at that time. He didn't, he didn't, she didn't say, I didn't understand why you applied handcuffs, and he didn't say, well at the time we didn't know what was what. That occurred about 10 minutes after Carpenter met with my client, and that was a different, that was the officer that would drive her, and that was 10 minutes later that that happened. So at the time that Carpenter was meeting with her, nothing had been explained yet, but regardless, the test is taking into account all of the circumstances surrounding the encounter. You have to take into account what my client had gone through getting to that point, because it's from her perspective of an objective, reasonable person in her situation. Would the police conduct have communicated to a reasonable person that she was not at liberty to ignore the police presence and to go about her business? Well, was she at liberty to do that? They don't know who she is, she's in the road, there's been a police shooting. What do you expect the police to do, I guess is my question, at each step of the way? What did the police do wrong? What the police very much did wrong is they never said to her, we're gonna, we'd like to take you to the police station and talk to you. Are you willing to go? Let's go in chronology. They arrive, she is in the roadway, they order her to get down, she does not get down. What should they do? Okay, we're starting back then at that point. Well, that's where you gotta start, Castle. Yeah, and again, it was clear, she's there, she's sobbing, she's hysterical, she's been in the middle of a gun battle. She could be armed. But she's kneeling passively, showing no resistance whatsoever. She's on her knees. She doesn't obey the order. She's told to get down and the officer says, you're not hearing what I'm saying? Indicating that he could tell there was something wrong there, so there was evidence that there was a reason to understand that she was in the midst of a severe psychological injury. You're pre-imposing upon a something that you and I can't even tell. If he's supposed to divine what her condition is at that time when she's supposed to be obeying orders. You can't, are you suggesting that we hold police officers to that severity? Yes, I mean, there was enough there with what he can tell. That he can tell when she's in immense shock? That's your argument. She's kneeling there, she's just kneeling now. The Hathaway case, was it Hathaway? No, no, it was the Fisher case. I'm sorry, the Fisher case. The person was kneeling. The defendant was kneeling. The court says that shows that there's not a lack of cooperation. The officer in this case testified that he didn't shove her down on her stomach, saying he bent down and just took her hands and handcuffed her, indicating that it wasn't necessary to do that. I'm aware that the law is that you don't have to use the least amount of resistance, but where it's clear that she's kneeling passively and very emotional, there was no reason to take that extra step. And that's where the abuse comes in on that claim. And then taking forward from her, having been subjected to that and brought forward and into the car, where nothing's been explained to her other than, oh, we're going to take you down to the police station, okay? With these confusing statements, which are obviously meant to intimidate her, because we're taking you, okay? She's already been treated like a criminal. Is she supposed to say, no, it's not okay, and risk getting them upset at her? There's a lot of material there in which you're covering, but if I can go back to the first part of what you're talking about, and that is on the excessive force claim. Under Cortez, you have to show that there was an actual injury from the actual use of force that is more than de minimis. Right. And so, and I think you've acknowledged that there was no physical injury, that you're not more than what the court allows to be de minimis. All right. So you're relying solely on the emotional injury, correct? Now on page 133 of the deposition of your client, she is specifically asked, what caused the PTSD? And the answer is, well, I'm sure that being in the house and seeing the shooting was part of it, follow-up. Well, and I assume that the suicide also contributed to it, and she says, well, certainly. In her deposition, did she identify ever, or correlating the PTSD or any emotional injury to the fact that Detective Whitehead had applied handcuffs to her and physically touched her when he put on the handcuffs in a prone position, and or putting his foot on her emotional injury to that application of force? I don't remember that being the case, Your Honor. You don't remember what being the case? I don't remember her testifying that way. What you're asking me, can I produce that for you? I don't think I can. She, but the tape reveals a woman in agony screaming, I didn't do anything wrong, I didn't do anything wrong when she was treated. It's the law that if you aggravate a pre-existing injury that you're responsible for what happened, and that unless something comes along that is completely beyond the pile and somehow breaks the chain, you know, that the fact that there are later circumstances that also contributed doesn't relieve that person for what they did. I mean, it's standard restatement tort law and things like that. So is there any evidence attributing the emotional injury? Your Honor, is this my time? Am I already down to four minutes and 51 seconds? I needed to reserve time for a rebuttal, I believe. Well, you may reserve time for rebuttal, but I have one question I need to fast forward on. If you, would you please tell me what you believe the exigent circumstance condition was? Was it the actual commotion and the shots being fired in inside the home? Are you arguing that the exigent circumstances didn't happen until they shot the gas canisters into the house? Yeah, my client's argument is that there were no exigent circumstances until the police created the situation. So you're arguing that the police created it by shooting the canister into the house? Right. Okay, thank you. Thank you. And I do want you to answer my question. Oh, I'm sorry. I didn't forget about it. I'm intimidated by clients. I feel like I should just leave. I am too. And don't worry, I'm going to give you time for your rebuttal. But is there, and I'm not trying to trick you or anything, but is there any deposition testimony that supports what you just said just a moment ago, that there was deposition testimony that said that her emotional injury was from the taking the deposition, and if they didn't ask her about it, she didn't answer that question. Okay, thank you very much. So I think you all are splitting your time three ways. I will explain, Your Honor. What's that? I will explain. Okay. Thank you. Just do your best to do that. We will. I may please the court, Your Honors. My name is Stephen Noel. I represent the Ogden City defendants in this case. I'm here with Josh Davidson, who will be making argument on behalf of the state and the Trooper Whitehead. And I will reserve some time for him. And then Danny Sapernich is here on behalf of Officers Weir and Perez. Counsel, if you're going to divide time, let them tell us who they're representing. Okay, I'll do that. Thank you, Your Honor. This is a qualified immunity case, Your Honors, and the District Court correctly ruled that the police officers involved, the defendants in this case, were qualifiedly immune from the allegations, rather the causes of action, alleged against these police officers in this case. And as we know, under qualified immunity, the defendant must be shown the defendant violated a constitutional right and that the constitutional right was clearly established at that time. Importantly, qualified immunity protects, as we know, all but the plainly incompetent and those who knowingly violate the law. Now, in this case, the plaintiff has failed to identify and the record does not support that there has been any incompetence on the basis of these officers or that they knowingly violated any right. And the District Court started with the second prong, and I think appropriately so, in identifying whether or not there was any clearly established law at the time that this took place almost six years ago, in November 2012. And the District Court judge couldn't find any, because we believe correctly there was none. It's important, I think, to this case that it's understood that the clearly established law must put the situation beyond debate. It must be that clear. And we recognize that it does not have to be a case that's directly on point, but it must be so clear as to put these officers on clear notice that the circumstances under which they are operating and the actions that they are taking violate this person's constitutional rights. And those cases do not exist in this case did everything that one would hope of police officers and law enforcement. As such, to penalize these officers under these circumstances would require clear precedent that what they did was unconstitutional in this case. In this case, as we know, the plaintiff was in the patrol car, and Mr. Davidson will address the excessive force claim at what point in time? At any point. From the point that Officer Whitehead apprehended the plaintiff. So he's going to explain, because he's the state highway patrolman. That's right. He came on the scene and was told, we don't know how these people may be involved. That's right. Police secure these people, and he secured the plaintiff and another person. Okay, so all right. Yes, thank you. That's why I need to know who's doing what. So I think as we saw this unfold on this very chaotic night, and your honors are very familiar with what happened, what preceded all of this, that the officers took quick action to try and identify everybody at the scene. Find out their involvement. And I think actually very impressively so. Under those circumstances, asking questions, taking out information, and once they find out who's who and who's involved, taking appropriate action. They remove the handcuffs. And at that point, things changed drastically. At that point, we have officers in every interaction with the plaintiff in an effort to comfort her, to provide her as much information as possible. In fact, they even go on a scouting expedition for her dogs to try to find them for her and deliver them to her. They then, as Detective Carpenter from the district court, in an effort to inform the plaintiff what's going on, what's going to happen, why it's going to happen. In fact, even seeks her consent. Now, the district court stated that her response to that arguably could be inaudible, but the district court herself indicated that it seemed to her that the plaintiff actually consented and said, okay. But in any event, these efforts to inform the plaintiff and to then transport her to the police station where, again, she's notified that she doesn't have to be there, she can leave. They're informing her of what's happening. She's not handcuffed at that time, I believe, or what we do expect of law enforcement. Our job is, and I try not to ask a question unless I need some help in understanding what's going on. Now, one of the places I need help, because you're reciting things that I've read all through. What I'm concerned about is, and I'm not really concerned about it, I just need to know about the warrant. Why was there not a telephone seeking a warrant with all the stuff? That's one of the issues at that rate. And that's one of the things that just happened to catch my attention, really, in this argument. So why did they not need to somehow, with all of this and the time that was going on, get a warrant? And was there even one necessary to get under these facts? No, Your Honor. Well, I figured that was your answer. One was not necessary. And that, I think, is crucial. Because at this time, when, from the beginning of the episode, from the event, when we have a person taking, shooting at officers, that starts a very important machine in process. And from there, we then have someone who will not obey commands. His intentions are very clear, and it's very reasonable for the officers to assume what he wants to do and how he wants to accomplish it. And from that point on, he then barricades himself in the home. And under those circumstances, clearly exigencies exist, and that a warrant would not be necessary. Can you give me a pretty general time frame of when this started with the officers being in, and then when did it end? I mean, how much, was it one hour, two hours, three hours? Your Honor, that's a very good question that I don't have a specific answer to, and I apologize. Well, will the record tell me? It should, yes. And one of my colleagues may have that answer to the specific time frame. So what was the exigency, that he may bleed to death, or, because there's talk in the record it's cold outside, that wasn't the exigency, right? That was not the exigency, Your Honor, but we have somebody holed up in a home who does have a firearm. The officers do not know what else he might have with him in the home, or who he might have with him in the home. And so under that very chaotic situation, they have to make the decisions fairly quickly. They try to do it with the best information possible. They consulted with each other on the scene and made their decisions together to then use the tear gas into the home. But those are the exigent circumstances, given his situation. The exigent circumstances, and that's why I ask your opposing counsel, what is the, you know, was the exigent circumstances the firepower going on and the bullets flying, or is he, as I see, he's arguing that the exigent circumstances didn't occur, that they couldn't be, because it was created by the officers when they shot the gas canisters into the house. Now, is there any case law that supports that the officers are the one that created the, in facts like this, created the exigent circumstances? No, not that I'm aware of, and that argument has kind of been made from the beginning and has never really, in my view, found any support, either in the facts, in my view, or case law, given the circumstances of that night. From the very beginning, those are when the circumstances began, and they're a totality of those circumstances that must be considered, and not to take them in nice sort of snippets, but the totality of what was going on that night created those circumstances. Can I ask you one question about when you, the colloquy with Trooper Whitehead, one of the arguments that Mr. Mortensen has made in his brief is that when she said, why do I need to go to the police station, and particularly in light of the fact that this is through the prism of summary judgment, why couldn't a reasonable fact finder, viewing the evidence in the light most favorable to the plaintiff, view the answer to be indicative of a lack of voluntary consent? In other words, the answer could have been, well, you don't need to go, we're asking you to go, but they told her why she needed to go. Why couldn't that be indicative of a lack of voluntary consent? Well, I guess, is it possible that that taken alone could amount to that? Maybe. But under the totality of everything that was going on that was explained to her earlier as well, and the level of cooperation between all of the parties, including the plaintiff, and the concern about her well-being, and all of that that was going on put together, I think, is what's important. And I think that under those circumstances there should be clearly established case law that would alert that officer that what he did or said was unconstitutional. I'll yield my time to the State. Thank you.  Good morning, Your Honors. May it please the Court, Joshua Davidson on behalf of the State Appellees, Trooper Whitehead, Colonel Fuhrer, and the State of Utah. Run those by me again real quick. Trooper Whitehead, Colonel Fuhrer, and the State of Utah. In the briefing it's just Trooper Whitehead that's at issue, and I'd like to briefly address a few of the points. With respect to the excessive force, Shiver's subjective belief that she did not act suspiciously or that she was in too much shock or too upset to pose a threat to Trooper Whitehead is irrelevant. The analysis on whether there's an excessive use of force is an objectively reasonable standard from the perspective of the officer based on the totality of these circumstances. And here Trooper Whitehead was responding to a call of shots fired, officer in urgent need of care, 1033 radio call. He arrived within minutes of receiving that call. He saw two people who he did not know their situation was, their familiarity. We were at a situation with an active shooter, one that was willing to shoot at responding officers. And Sergeant Reeves actually said when he got out of his car, secure these people, I don't know who they are. So based on the totality of circumstances that there wasn't an excessive force by Trooper Whitehead. Judge Bacharach, with respect to your question, there is no record evidence of emotional injury that is specifically attributed to Whitehead's initial use of force. And then turning to voluntary consent, Trooper Whitehead was an assisting officer. He arrived at the scene at 234. He placed Ms. Shiver's in the back of his car at 236. And he was out on the perimeter. He did not return to his car until 422. And so he was not privy to any of the conversations that Ms. Shiver's had with the officers from the various, from Weber County, Ogden City, the SWAT team. He was not privy to that. He was asked to drive her to the police station. As an assisting officer, he was entitled to rely on the either probable cause determination or voluntary consent determinations of the requesting officer. And there was no law that required him to second-guess those officers' decisions. With respect to your specific question about the statement, why do I need to go to the police station, this doesn't put Trooper Whitehead on notice that or give him any reason to second-guess or to be constitutionally required to second-guess the requesting officers. She was just asking for information. Her question didn't amount to a protest or a revocation of prior consent. And the nothing put Trooper Whitehead on notice that he was required to engage in second-guessing those officers. Well, and that may be pertinent to the second prong of qualified immunity, but on the first prong of qualified immunity, therein you have a problem, because here, with voluntary consent, the prism is not from Trooper Whitehead's perspective, but from the plaintiff's perspective, whether or not she had a reasonable expectation that she was free to leave. Well, Trooper Whitehead was present when Carpenter came up to her and said, we're going to say, you know, are you going to go down to the station? Is that okay? Is that all right? And then he observed that. She didn't protest. She immediately started asking about her dogs and taking care of her dogs. She volunteered, even when not asked a question. She overheard officers talking about cars in the driveway. She immediately volunteered to assist the officers. And at no point did she convey enough information to Trooper Whitehead that she wasn't there for his own accord. Trooper Whitehead's testimony is, I assumed that, you know, this is an Ogden City show. I wasn't there for any of this. I assumed they had reason to hold her or that she was there of her own accord. And nothing that she said in the car in front of Trooper Whitehead made it unreasonable for him to rely on the determinations made by the assisting officers. Do you need time? Well, you're out of time. I'm out of time. I'm just making sure. I was going to give him a second. Well, so you're the third lawyer? I am the third. All right. Thank you very much. Okay. Do you have any further questions? With respect to the timing, I think there was a question on how long this lasts. I'm sorry. I'm sorry. 232 is when I think the shots fired was. Trooper Whitehead dropped her off at the police station at 5 a.m. So the whole thing lasted about two and a half hours. Thank you, Counsel. We'll give the felon an extra minute for your rebuttal. Your Honor, I didn't get a chance in my first go-around to mention this policy and the practice there of automatically hauling witnesses to the station and so forth. I don't want it to be forgotten that we presented a lot of evidence on that. I think that we have presented a genuine issue of material fact that there was a policy there and that certain officers, knowing of that policy, had a duty to make sure that my client would not be taken to the police station without obtaining consent. Mr. Morrison, that policy is only Weber County's, though. It's not the City of Ogden's, correct? It was countywide. All of the municipalities. Right. It was for countywide. It was a Weber County policy, not a City of Ogden policy. It was also a City of Ogden policy. There's a document cited. All of the municipalities, including Ogden City, are signed onto it, including the SWAT team. Well, the SWAT team is not signed onto that document, but we have other evidence showing the SWAT team's protocol showing that they're a part of it. I, in my brief, explained that Officer Whitehead took possession of my client not on a basis of probable cause or relying on anything. He was just simply securing the scene. And having placed her in his car, he had a duty to make sure that her rights weren't violated. He couldn't just take the position that somebody might have done something. He was in no position to take that position. Would it have been unlawful for Trooper Whitehead to have told her that, you need to stand right here, we have an active shooter in the house, you can't go into the house, I want to see where you are, so you stand right here? I think Summers v. Michigan implies that the officers could require her to stay at the premises.  If Trooper Whitehead could say, you stay right here versus I'm going to take you to a place where I don't have to stand there and watch over you, I'm going to take you to the station. Why is that constitutionally significant? First of all, she wasn't just taken there for protection. She was taken there for investigatory purposes. She was interrogated. So she was taken for that purpose. Second of all, Summers and not of Dunaway, Summers was a cautious exception to Dunaway that you cannot without a warrant, you know, you can't take possession of somebody like that, custody of that, and violate their rights to move around. And Summers said, we'll let you keep people when there's a warrant to search your home. We'll let you allow you to keep witnesses there. There's been a subsequent case with the Bailey, you know, that ruled where the person was across town. They went and grabbed him. You can't do that. So what you've asked me I think goes in the context, no, you can't take her out beyond the realm of where that was there. My client at all times indicated that she was willing to be there in that car there. She wanted to help. She didn't want her boyfriend to be killed. Well, that's precisely the point, is that's what the officers wanted too. They wanted help from her. They wanted to know the inside layout of the home. She wanted to help because she didn't want her house blown to bits by CS gas. That sounds to me like she was consenting to answer their questions that would help. No. No, she wasn't. Because she was willing to help there to take care of the scene. She was completely unwilling to be taken away, to be treated like a criminal, interrogated where she could not be there to help. She was taken away where she was no longer there to help. She couldn't help from afar by laying out where. Oh, I'm talking about taking her to the station. Sorry. Taking her to the station. I'm down to 34 seconds. We still want you to answer those questions. Well, it was okay for her to help there. Again, it was absolutely wrong to haul her to the station and interrogate her. That violated Dunaway and all these other cases that we've cited. And there is just not evidence there that an objective person would have been able to say anything to the officers other than whatever you say. And there's the zero on my clock. Thank you very much, counsel. This matter will be submitted. Thank you, counsel, for both sides for your excellent advocacy.